The next case for argument is 24-2002 Regeneron Pharmaceuticals v. Mylan. The district reports infringement, validity, and remedy judgment for the licensee. Let me ask a housekeeping question. Page 7 of your blue brief, there's a chart. I'd like you to turn to it. The chart shows that Lucentis has anti-VEGF. It then shows that both Yesop, Yesophila, and Ilea have anti-VEGF. On the same page, you say Yesophila adopts Genentech's prior art anti-VEGF intervitrile Renz-Bisglau formulation, Lucentis, not Regeneron. Is that correct? Yes. We're differentiating between the active ingredient, which is the anti-VEGF compound, and the formulation that you actually carry the drug in, which is the formulation. All of the formulation ingredients are all of the ones that are under the anti-VEGF drug descriptor. Histidine is the same for Lucentis and ours. Trihalose is the same for Lucentis and ours. Polysorbate is the same for Lucentis and ours, and then water. Those ingredients that are under anti-VEGF, those are the formulation ingredients. The drug is the anti-VEGF compound. Lucentis has the anti-VEGF drug compound, Ranibizumab, and Yesophila and Ilea have the anti-VEGF drug called Aflibercept. However, if you look at the formulation ingredients, and that's what the 865 patent is about. It's directed to pharmaceutical formulations. Our pharmaceutical formulation is actually different from the commercially marketed product. We use a histidine buffer, they use sodium phosphate buffer. We use trihalose as a sugar stabilizer, they use sucrose. Polysorbate gets in water, obviously those are all the same, but Regeneron also adds a salt that's called sodium chloride. So they're not identical formulations. Okay. There are a lot of issues in this case. And you've got a 300-page disrecorded opinion. So it's kind of hard to tackle. But let me just ask you some scattered questions. Some of my questions are about obviousness and then about anticipation. But what obviousness combination are you appealing? Is it Dixalone or is it Fraser and Gutter, whatever the other one is? Yes, both. So there were two issues. So first we said that the claims were obvious in view of Dixalone, because Dix is the one that basically does have the ILEA formulation and really the only difference is the dose amount in terms of a range versus what Regeneron calls a species. Then we also had what we are referring to as the descriptions of a Fliverset that were in the prior art, which is a Fraser reference, in combination with what we're calling the Lucentis prior art. And that's comprised of two main references, one of which is the Goudreau reference, the other of which is called the Shams reference. But both of those references were essentially discussing this type of Lucentis formulation here, where it's an intravitreal formulation. It was actually used in the eye and had the anti-VEGF drug in it. How do you pronounce that anti-VEGF drug? So Ranibizumab is... Can we just call it the R-drug? We can absolutely call it the R-drug. And then the other one, the A-drug, is a Fliverset. A Fliverset, and that's an important one. We should say a Fliverset. Well, let me take you back to the anticipation. I mean, the two issues that are not disturbing to me that raise some questions are this criticality and the anticipation of 40 versus 10 to 50, and then the teaching the way that the district court found. So what is your view of our case law and what it compels with respect to that? Sure, and I think you see that in cases such as Fairview. Yeah, it's hard, though, because I don't think we've found a case. You've got cases with one range and the other prior art has one range and the PAM has another. You've got some where the prior art has one and the other. But I haven't found a case which is our case, which is the prior art has the range and the patent has just one. Right. Well, I think that one of the close ones that would come up would be the Purdue Pharma versus Epic. In that instance, you had a situation where it's similar to what Regeneron is arguing here in the sense that you had a broad description for the drug compound that was in the prior art that was for analgesics treating pain. And then this court said it was anticipatory to have a formulation that was directed to opioids and opioids and analgesics. And the reason why is because opioids were obviously known and established to those of ordinary skill in the art, in the background knowledge, as drugs that were used with analgesics to treat pain. And in that instance, you didn't even have the prior art reference mentioning opioids specifically. But again, it was understood in the sense of what does a person of ordinary skill in the art, when they see the reference, actually understand it to be not just teaching in terms of specific examples, but also what is the nature of the enabling disclosure? And I think that's fundamentally where the district court fell down here because the district court was very much focused on, well, you don't have an example that was actually put to intravitreal use in DICS. The problem with that, though, is that, and Your Honor, to get to your point in terms of the chart on page 7, if we were to look at the ILEA formulation and we look at the formulations that are in the examples in DICS, you have those identical ingredients there, in instances in the same amounts. So the only distinction in terms of what was there was a drug amount, 10 to 50, versus they limited their claims here to 40. And when you have an enabling disclosure, and, in fact, when the 865 patent itself says that not only that particular drug range in DICS, but an even broader range from 1 to 100, is also going to work to give you these samples. I'm sorry to interrupt. I'm a little confused. I would have expected you to have said the word criticality by now. Sure. And you didn't say it, so I'm now... Well, and that's what I... You went off on Purdue Pharma and then went to some other territory, and my understanding was the focus of your briefing was it was the patent owner's burden to show that the 40 milligram per milliliter formulation was critical. Right, because that gets to the gene of species issue. And then, obviously, the district court found otherwise, and now we have to sort out what does our range case law really say and demand in terms of making an anticipation case. Right, and you're exactly right, Jeff Shinn. I think this is one of the reasons why the district court went astray as well. To me, when you're looking at criticality issues, you're looking at what is claimed as compared to... Well, the first question is, before we try to assess what does criticality mean, is do we even look to criticality in the first place? And so the district court said no. In this context, we don't, because there's a case called Adafina that says you just look at size of the genus, and then if I conclude that the genus was too big, then I don't have to go any further. There's no anticipation. Right, but I think that if you look at subsequent cases, though, that have interpreted and applied Adafina, such as the Clear Value Polymers case, the critical issue in terms of why were we concerned that that genus in Adafina was so big is because it was not actually describing and enabling what came later in the claimed species, so much so that it actually did operate in a different way. And I think that in the Clear Value case, they make that clear, that when they were discussing Adafina, they said, yeah, but in Adafina, that species that was selected fundamentally worked in a different way. So that's new. And just getting to Judge Prost's initial question, cases like, I don't know, Ineos and Clear Value, et cetera, those seem to be a claimed range inside of a broader prior art range, right? Sure. And here we have not a claimed range, but a claimed point. And then the question is, well, when we look at Ineos or Clear Value or anything else I can get my hands on, I don't see that specific fact pattern. A prior art range and then a claimed point inside of that range. Do we think about that fact pattern the same or differently from the claimed range inside of a prior art range? Right, and that's why we went back to some of the earlier classic cases such as Petering and Gershig. And I think there again, when you look at what those claims are talking about, when they're saying, you know, it really gets back to when I think the phrase used was, was it really described for purposes of Section 102B? So I think here when you have a situation where we have with DICS and with the formulations here, you have the same ingredients, the same drug involved, and you've got a range of scientific... You're getting back to the fact that I'm thinking about the law. Right, but I think from the legal perspective, I think you make the, you just get back to what was described and enabled. So for example, you know, do we have any blaze marks that sufficiently direct a person of ordinary skill in the art towards a particular issue? That, you know, maybe if you've got a genus that's got, you know, 10 billion compound possibilities in it and now I'm going to select a single compound species, maybe that's not going to be good enough. However, if you have a situation where you've already got an existing range and the district court here actually made findings that, you know, that a person of ordinary skill in the art would certainly be able to make the full scope of what's within this range, and it's the composition, and you haven't articulated any new use or any particular way in which this composition... But if it's not that specific number, the patient has a possibility of blindness. No, see, that's one of the issues with the district court where I think the district court actually got the test wrong because when you're going to talk about criticality, it has to be criticality against what that prior art range was. So show me that 40, the species, somehow performs differently than 10 to 50, and he didn't make that finding. He said, oh, well, let me look at how I think it might compare based on how a ranibizumab drug compared and how a ranibizumab drug performed... Is it also your view that the burden was placed on the wrong side in terms of establishing criticality? Yeah, I think Regeneron had to first come forward with some type of demonstration that there was criticality, and moreover, to get to your point, tie it to some teaching in their specification so that the public is actually getting the benefit of a quid pro quo. Well, let's assume for the moment that we don't have to worry about express disclosure and specification. But I am trying to understand what, in your view, should Regeneron have done to establish criticality? I think Regeneron should have shown that there was something unique and special about 40 that worked better or differently as compared to everything else in the range of 10 to 50. When you say better, I'm just trying to get an understanding of what you think. Sure, one that meets the court standards, for example, of a difference of degree and not in kind or a new established utility, or something that actually a person of ordinary skill in the art wouldn't have been enabled to do with this composition that they already had in DICS. And that's where I think we get to the fundamental problem here is that particularly once the district court said that these claims... Getting to some of the other issues on 102, it seems like the district court identified other reasons for why there's a lack of anticipation of the DICS reference aside from this 40, 10 to 50 fitment. Sure, well, the only other one that he really focused on is he said, well, I don't see that you have an actual example of 40 milligrams per ml being put to intravitreal use in DICS. And he said that when DICS was talking about use of VEGF fusion protein, that that wasn't specific enough to get you to sequence ID number 4 The problem, however, is that that is a very myopic view. It's not actually looking at the specification as a whole because in the specification as a whole, number one, all of DICS's examples use sequence ID number 4. In the preferences that DICS expressed for his preferences for the VEGF antagonist, he says, I prefer preferably sequence ID numbers 2 and 4, more preferably sequence ID number 4. Well, there's a blaze map to that. So... Do you want to check if that was a test? Or anything? Do you know what it was? Why don't you just go ask Lucia? Let's pretend that's a decimal. What about... Did he say it was okay? Okay. Thanks.  What about the 98% stability limitation? I think there was a finding that,  even if DICS discloses the 40 milligrams in all of the nucleotides, there's nothing in DICS that necessarily leads to that particular formulation that would get you this particularized stability limitation. Sure, and I think there again, the district court was not focused on, does DICS have an enabling disclosure? And here again, that's where I think the clear value polymers case is quite relevant because in that case, they had the 150 or less, they only had an example of 60 to 70, but nevertheless, 50 was sufficiently enabled. Here, DICS had a 25 milligrams. We good? Yes. Thank you. DICS had a specific example, with a Fluttersat, all the same ingredients as ILEA, that was 98% stable or more at 25 milligrams per ml. He had another one at 50 milligrams per ml, also more than 98% stable. So there again is where I get into... So did you have, I don't know, expert testimony or somebody say, yes, definitely. You can take it to the bank. If you did a 40 milligram version of DICS, you would get the 98% stability. Yes. And in fact, how do we know that you actually do get 98% stability? Because that's what the ILEA formulation is. It's not like... We're working backwards with a DICS formulation, a DICS disclosure, and then trying to figure out whether DICS discloses this claimed embodiment. And at least on this 98% number, if there's something you can show me in the record, where there's testimony, evidence, something. I mean, I thought I saw something where an expert said maybe most likely you would get 98%, but then to me, that doesn't quite tie things off for a true anticipation. Right, well, but I guess the issue is, Your Honor, again, these are formulation claims, and Regeneron, to justify enablement, and the district court made findings, I'll have to find a specific page, where he said, Well, you know, once you have a stable example to follow, and you have an ingredient list, then, of course, you can make all of these other formulations stable because that's just routine experimentation. And furthermore, even in the 865 patent itself, it concedes that, and this is at column two, lines 53 to 57, they say that an even broader set of stable liquid formulations are going to have 40 to 50, which includes Dix's number, and are going to be able to be these stable liquid formulations of the invention. It actually does happen, and again, these prior references are also under this court's case law, presumed enabling, for the full scope of what they disclose. Regeneron is the party that should have had the burden to come forward to say, Well, if somehow there's a way in which you practice this that does not actually lead to stability, but they couldn't do that here because the very argument that they made to justify enablement is that once you've got an example to follow, and they used 40 and 50 milligram examples, here Dix has 25 and 50 milligram examples, then you are sure you have enough to get your stable formulation. I just want to make it clear right now, I'm not worried about 112 considerations or anything like that. I'm only concerned about little old 102 and whether this one reference has everything that's in the claim, and that's all I need to know. Why should I feel comfortable in flipping the district court for making an unreasonable finding that Dix does not disclose the 98% limitation even if it discloses the 40 milligram formulation? Because Dix actually made the 50 milligram formulation 98% stable. He made a less concentrated version, 98% stable, and this court has never held that you have to have an actual practiced example in the specification in order to anticipate. You need the enabling disclosure. That's the critical issue, and Dix gave the person of ordinary skill and the art, the enabling disclosure for 40. And if I may, if I can talk, I don't know if we need to. I want to take you back to criticality. Did you have something else? No, no. I just don't remember my time, Your Honor. No, I know. We're going to be here a while.  We're back to criticality. Right. I think, and I'll discuss with your friend why I think the district court's findings may have put the wrong burden and asked the wrong question, but did Regeneron put up any evidence to show criticality? Within the range of what was already disclosed by Dix, no. All of the criticality evidence, and this is reflected in the district court's findings, was focused on, well, here's how a flibber sept performs relative to ranuncism because of this inflammation risk. And because of that, that to me is exactly the problem here, is that these are composition claims The district court construed the claims that's suitable for intravitreal administration. It only meant you need to have, Judge Wallach, the list of ingredients on Claim 7 that had previously been used in intravitreal formulations or in another example. We have that in Dix. So if we look at those court cases, usually when you're assessing criticality, it's, is this, are we seeing some unusual property as compared to the genus? And that's what we don't have here. We don't have any evidence showing that 40 mg per ml within the scope of the 865 claims is always going to outperform the Dix formulation. And they're not going to get there. In 8159, the district court makes the findings that it's 40 mg per ml limitations with some kind of, maximizing half-life, of the flibrocephalophenia in terms of minimizing toxicity and stability concerns. Right. So the question in my mind is, is that enough to show this is something, this establishes that this particular value, 40, is critical to the operability of this drug product. Right. It's not, Your Honor, because first, if you actually go look at the citations that the district court offered to cite it, those citations don't actually say that.  because Regeneron here is trying to say there's something special about 40, well, you're going to get those same results if you're at 41. You're going to get those same results if you're at 39. How do we know that? Well, we know that because there is... What's the testimony to that effect? That's Mr. Trout, no? Sure. The testimony here is that, and all the district court is saying is they chose the 40 milligram concentration to maximize the half-life of a Fliverset in the eye. Well, a Fliverset, that's the molecule. And then that was already known in the prior art. The half-life had already been established. That's in the Full-Ash publication. So the more potent, the higher potency of a Fliverset, and it's expected longer half-life in the eye, that was already background knowledge to one of ordinary skill in the art. So when it comes to then minimizing toxicity and stability concerns, this is where I get to, to get close to your point, is that Regeneron never came forward to say there's anything different. They don't say it in their own specification there's anything different about 40. I can certainly get you the testimony where the named inventors and Dr. Trout all agreed that in the 865 patent specification, they say nothing about that these formulations are going to have a better half-life and that there's some kind of superior technology or outcome that's going to result from this as against the broader range that was originally disclosed and claimed and in the specification itself that it admits is going to be a stable introvert formulation suitable for injection. And furthermore, none of those particular elements actually made their way into the claims. So if we're going to look at the scope of what has actually been claimed here, these particular efficacy elements are not there. And Regeneron in their briefing was quite adamant that these claims should not be construed as requiring anyone or any composition to meet any efficacy standards. So if we were to go back to this court's recent decision in Janssen v. Teva, which we cited in our brief, 97F4, I'm not sure what the pin site is, this court was very clear that when it comes to doing these types of comparative analyses, if it involves an element that's not actually in the claims, you should be very concerned. You shouldn't be considering that as somehow establishing unexpected results or anything along those lines. Okay. We will restore some of that when we have time. Any more? Your Honor, I did want to emphasize as well if I could, I don't know, on the non-infringement issues. No, we're not going to. We have the briefs for that. That's fine. Thank you, Your Honor. Good morning. May it please the Court. My name is Andrew Trask of Regeneron. My friend on the other side focused her remarks on 102 and briefly on 103, so I'll do the same unless the Court has other questions. Can we start on 102? Yes. And can we start on criticality? Yes. I think, tell me if I'm wrong, the District Court said you don't need to show criticality because of the size. So let me first ask you about the size. Two different, even if we read Adafina, our Court has not subsequently read it, but in any event, the size is different and it's much larger in Adafina than it is here. So I don't know how slam dunk, full stop, the size there takes the size here. The other question I had about size, so you can respond together, is that your expert talked about, yeah, there are a million things in this because we're down to the tenths and the hundredths, but there was nothing I could find in the record, so you can show me, where that's the way, those are the kinds of calculations that we use with respect to these drugs. I mean, it seems to me, as in Adafina, we had degrees of 100, 200 integers and not expanding the scope into the hundreds or even the thousands. Then you can have millions no matter what the scope. So if you could respond to that first step before we get to Cris Cali. Yes, Your Honor. Happy to. So on the size of the genus here, there's two important considerations. One is that there was testimony from both sides' experts that this was not a small range. So not a small, where does that get us? Not a small range. Right. So part of the analysis here is, as the Osram case explained, the perspective of the person of ordinary skill in the art and how they would view the size of the range is an important consideration in these overlapping ranges cases. And so that's where that testimony goes, is to that factor under the Osram case of this court. Both sides' experts acknowledge this is a large range. Dr. Rabinow, Milan's expert, pointed out that it encompassed digits to the tenths and hundredths place, which the district court found that that encompassed hundreds or potentially thousands of discrete values. So both experts agree to that? That you look at the range, you don't just look at whole numbers, but you go all the way down to the tenths or even the hundredths? Dr. Rabinow, Milan's expert, testified on cross-examination that that range encompassed not just whole values, but also digits to the tenths and the hundredths place. This is at, the district court acknowledges, made its finding at A157. Dr. Rabinow's testimony was at A9496 through 99 on that precise point, Your Honor. And then Dr. Trout, Regeneron's expert, also testified expressly that this was not a small range in the eyes of the POSA. That's at A10448. So that goes to the size of the range, but there's an even more fundamental issue here that distinguishes this case from some of the other overlapping ranges, cases of this court. So in the Adafina case, the Clear Value case, the Osram case, and others, the difference between the prior art and the claimed invention was the identity of the range. In Adafina, it was a range of degrees Celsius disclosed and a range of degrees Celsius claimed. Clear Value was a PPM range disclosed, a PPM range claimed, and so on. Here, there's a different scenario. There's agreement by the experts that the range in the prior art of 10 to 50 milligrams per milliliter was not specific to the claimed protein. It was not disclosed as a range of 10 to 50 milligrams per milliliter of a Flivr set. It was disclosed as a range of a genus of fusion proteins. Genus of what, two? No, more than two, Your Honor. So Mylan's own expert agreed with this point. He testified it was a class of proteins. That's at A9497. And what the Dick's reference says expressly at A12593 is that this 10 to 50 range corresponds to a genus of, quote, VEGF-specific fusion proteins. And there were two proteins called out specifically by their amino acid sequences in the Dick's specification. But there are other proteins within this class of fusion proteins that apply to this range. How do we know that? Dr. Rabinow testified to it at A9496 through 99. And Dr. Trout testified to the same at 10, sorry, A10499. What did they say? Did they say it was four fusion proteins, 14, 400, 4,000? The upper bound on the number of fusion proteins encompassed by this class was not the subject of precise testimony, but the testimony was clear and it was agreed by both sides and the district court found at A157 157. Yeah, that the 10 to 50 range in the prior art was not linked to a flibberset, a flibberset-specific link. And because of that, what we have here is a genus on top of a genus. So we have a genus of fusion proteins and a genus of concentrations of fusion proteins. And so this is unlike... I'm just confused because the Dick's reference only calls out to species, right? The disclosure says the Dick's reference, apologies, the passage of the Dick's reference that we're referring to here is at column two, lines 21 to 23. And this disclosure of the 10 to 50 range refers to this genus of fusion proteins and it describes how they're made up. They have receptor regions, they have a constant region. So it's describing this genus as more than just the two discreet disclosed amino acid sequences, but rather this genus of proteins that contain these different structural features. So that's clear from the Dick's reference. It was agreed upon by the experts from both sides and it was found by the district court that without, we would submit clear error. So this is a different scenario from the other overlapping range cases where you have the same parameter in the prior art and in the current range. But if we were to just put that to the side for a moment, then if we were to read any of the clear value, especially the way they explain the meaning of adafina, then would you agree that putting this one factor to the side that when we have something like this, 40 milligrams per milliliter inside the range in the prior art at 10 to 50, then it's incumbent upon the patent owner to show and demonstrate some kind of criticality. So I acknowledge that those cases involve criticality in the context of overlapping ranges, of course. Criticality was not required here as the district court correctly found for several reasons. One, there were other... I'm just trying to understand our case law. That's what our case law calls for. So what the case law calls for, and I think what you're referring to, Judge Chen, is that upon a showing of prima facie anticipation, the burden shifts to the patent team to show criticality. So the threshold question is, did... If the range overlaps with the prior art range, then it's incumbent upon the patent owner to show criticality for its claimed range. Is that a correct understanding of our case law? That's not my reading of the case law precisely. Okay, then what is it? If there's a prima facie case of anticipation, it's not simply a question of whether the range is overlapped, but as Osram explained, for example, what is the size of the genus in the eyes of the post-it? That's an important consideration, this course precedent says. And so the question of whether that threshold has been crossed and whether a prima facie anticipation case has been made out needs to consider the size of the range, whether there's an overlapping genus, as we discussed a moment ago, all of those factor into whether a prima facie... Did genus or clear value talk about the size of the prior art range? I don't... Yeah, clear value talked about the relative size of the prior art genus. I'm sorry, I think... I don't know the answer to that question off the top of my head, Your Honor, but the Osram case certainly discussed that as a factor in deciding whether the burden shifts to the patentee. And all of, you know, as I think Your Honor pointed out earlier... Yeah, so, as I understand your argument, you've got roadblocks you're putting up before we have to worry about criticality. One is we're dealing with, as you would call it, a class of VEGF antagonists, and two, the size of the prior art range is just too big. That's right. There's also... There's no... Well, I would say those are the main considerations. Okay, but didn't the district court also say even if there were criticality and go ahead and analyze criticality? That's correct, Judge Preston. Okay. We stand by the district court's finding that there was no need to show criticality, but even if there were a need to find criticality, the district court made ample findings on the record here regarding criticality. Isn't it peculiar, though, to try to do a comparison with the claimed embodiments against this R drug for teaching away an unexpected result? Because as I understand it, there's not a lot of case law on criticality, but it seems like the thrust of the thinking for criticality is comparing what you claim against other embodiments that come within the prior art range. So the district court didn't... So that's the type of apples-to-apples analysis you have to do, not an apples-to-oranges analysis comparing your drug to some other drug. So there was no dispute here that the Goudreau reference, which is the one that discloses the R drug, was the closest prior art here, and so, in our view, it was appropriate for the district court to draw upon those comparisons, but there were also comparisons that were specific to a flipper set. So I would direct Your Honor's attention to the court's findings at A159. These are the findings of criticality that I think Judge Chan, you pointed to earlier in the district court's opinion. I didn't really see a comparison between here's why 40 is special. Right. Because look what happens when you do 45 or 35. Right, let me address that because I do think that there's a direct linkage between the claims of 40 milligrams per milliliter and the criticality findings on page A159. And so the district court on A159 cited several witnesses' testimony. Well, first she says no record evidence shows that these desirable benefits of the claimed invention would obtain at other concentrations between 10 and 40, right? That's what she says in the middle of 159. That's correct, Your Honor. And accordingly, even if anticipation law required is showing a criticality, undisputed evidence at trial demonstrates that the 40 concentration is critical to the benefits. Is that the right standard? Firstly, I think she put the burden on, let me just throw this out. She put, arguably, she put the burden on them, not on you, is that right? And the inquiry doesn't seem to me as whether the 40 milligram concentration is desirable, but whether it's critical to the operability of the claimed invention. In other words, the claimed invention is critical only if it can be shown that the claimed invention only works for 40 milligrams and not for others. So I don't understand how her analysis of the evidence jives with what I understand to be the criticality analysis. Understood, Your Honor. Let me explain that. So on that same page, and in fact the sentence before the one that Your Honor just quoted, the district court judge plea found that the testimony at trial demonstrated that the inventor specifically chose the 40 milligram per milliliter concentration to maximize the half-life of the liver ceft in the eye while minimizing toxicity and stability concerns. And what the district court is citing there is the testimony of two of the inventors of the 865 patent, Dr. Firfine and Dr. Graham. And what that cited testimony says is, first of all, Dr. Firfine, this is at A9075, said that if you double the concentration of a liver ceft, you get an extra half-life. So the concentration of a liver ceft in the formulation is tied directly to... Everybody knew that, though, right? That's not right. Everybody knew that if you increase the concentration, you're going to improve the half-life. That's not... There's no finding to that effect, Judge Shannon, and that assumes some kind of a constant, like a linear increase in pharmacokinetics of which there was no finding that that would have been the case here. This was found by the district court to be a key insight of the inventors in developing this formulation. When you say key insight, what is the key insight particular? Not that you drive up concentration, you drive up half-life, but there's a correlation. The finding was that the concentration is directly tied to the half-life, such that if you double the concentration, you get an extra half-life, coupled with the additional testimony cited by Dr. Klee... Dr. Graham testified that the propensity for aggregation... Sorry, this is at A10040. That the propensity for aggregation of the fluvacet increases as the square of the concentration. And so aggregation as well, which was acknowledged by experts at trial from both sides, was an extremely concerning phenomenon for this drug, which is injected into the eyeball. And so what the inventors found was that the propensity for aggregation increases as the square of the concentration. Again, supporting Judge Klee's finding that they minimize toxicity and stability concerns by using this particular concentration. Because the question that still remains is that the prior art range is 10 to 50. You've claimed 40. And I don't see anything in the record that indicates here's why 40 is something different, and therefore critical to the operability of our claimed drug product compared to other things that are in that prior art range. And I thought that that is the nature of the criticality analysis. I mean, can we agree on that? That we have to look at the performance or the properties or the operability of the claimed embodiment against other things that are in the prior art range? I think that's a fair characterization of the criticality inquiry. That Osram, for example, says ask whether the claimed value is central to the invention. I think the, and whether the invention would operate differently at various points within the range. Okay, so I think that's what I'm wondering is whether there's a gap in this record or in this case when it comes to the analysis on criticality. So I don't think there's a gap, Your Honor, for a couple of reasons. One is the testimony concerning the precise concentration selected by the inventors as found by the district court at A159, which balanced the half-life with concerns regarding safety and efficacy, as well as the district court's findings regarding unexpected results. And so these findings are at A198, and the district court found that the 40 milligrams per milliliter of the Fliversoft claimed and all of the asserted claims had three critical and unexpected properties, safety, efficacy, and durability. And the court went on to explain how it was that this 40 milligrams per milliliter concentration was surprisingly comparable with respect to safety and efficacy compared to the closest prior art, which the parties agreed was the Genentech Lucentis, sorry, Goudreau reference, and also had durability to be dosed half as frequently. As your honors can imagine, getting an injection into the eyeball is not a pleasant experience for patients, and so this was a revolutionary advance the district court found to have to dose patients only half as often. So that finding as well, I think, supports the district court's finding of criticality because it shows that the 40 milligrams per milliliter concentration claimed in all of the asserted claims is critical to the invention and distinguished the invention from the closest prior art, which the parties agreed was the Goudreau reference, which referenced the R drug that your honor mentioned. So the other thing I'd point out is that the testimony from Dr. Firfine, one of the inventors, that connected the concentration, 40 milligrams per milliliter, with the half-life of the flippercept was unrebutted. The district court found that at A200, and there was no challenge by Milam to that finding at trial and certainly on appeal. And so there's multiple ways in which the district court found criticality. The connection to a flippercept itself through the testimony of Dr. Firfine and Dr. Graham, as well as to the comparison to the closest prior art in the Goudreau reference. Getting away from the Fix-102, you're not relying on the preamble, are you? The use in intravitreal administration compared to the cancer treatment that was disclosed? The preamble was never a basis to distinguish the prior. I saw the district court in part rely on that, and then I saw that in the record that's not. I don't think that's right. It's certainly true. Who's saying that's not right? Which part's not right? I don't read the district court's decision as relying upon the preamble. I'll just write the words from his opinion then. Can I ask you one other question? I'm not sure, Your Honor, which passage was I supposed to be referring to, but there was no dispute by the parties that there was no efficacy limitation built into the suitable for intravitreal administration term. It was never a term that either party had proposed to construe, and so there's unrebutted testimony by Dr. Trout that what that limitation means is contained components that can be used intravitreally and nothing more. What about 98%? How are we supposed to think about that? The other side, we heard say, essentially, the 98% would be there in DICS, which you use the 40 milligrams a milliliter because all the examples at other concentration levels got you to the 98%. I don't know. 98% is what the FDA wants, so 98% is really not very meaningful here. Two responses to that, Your Honor. One is I think you put your finger on it when you asked my friend on the other side about the testimony that best supported the notion that there would be 98% in 40 milligrams a mil from the DICS reference, and you pointed out that the most the expert said is it would be most likely. That's at A10526. That was your expert, right? That's our expert, correct. He acknowledged it. What did their expert say? Their expert offered no testimony on that fact, and what it seems to me on appeal is that they're arguing almost kind of an inherency type analysis, but certainly that was not a theory that was run below. And there's no evidence to support that necessarily there would have been 98% native confirmation in one of the DICS formulations. Frankly, what impressed me was how often Rabinow and Trout agreed with each other, which is unusual in redeemers. It is refreshing, perhaps. I agree with you, Your Honor. The other point I wanted to make in response to Judge Chan's question... You have the lawyers that have like 40 disagreements. Well, I can't help that. There were a lot of issues raised in the opening brief. On the point about 98% being a known FDA requirement, I think this is an important point to flag. Milan made this argument at page 24 of their reply brief. They say, quote, 98% native confirmation was a known FDA stability requirement, unquote. In support of that statement, they cite Dr. Graham, and I encourage Your Honors to look at that testimony. This is at A10102-03. Dr. Graham said precisely the opposite of what Milan represented there. Dr. Graham said that 98% native confirmation was, quote, not an obligate requirement, unquote, for... What volume are you at? This is, I'm sorry, A10102, which is long in Shula. We've been talking about DICS-102. I'm just curious. If DICS-103, your reliance on 103C1, couldn't be conclusive yet, right, if we were to conclude that there was a problem with criticality because the district court never made an assessment on whether the 865 is entitled to an earlier provision application filing date. Is that right? So, I think part of the reason that DICS was not a focus of Milan's... I'm just trying to get to the bottom of something. I just need to know for housekeeping. Sure. So, our view is that DICS is not a proper reference under 103 by virtue of the fact... Right, but the district court did not make an assessment on whether the patent's entitled to the provisional priority date. The district court did not make that finding. That's right, Your Honor. Yeah, and so, if the court decides that it can't reach that question as a result, then it wouldn't reach the 103C question, but our view is that DICS... I mean, I could just keep asking questions. Well, to get to teaching the way, because I'm sorry, I'm thinking about too many things at one point, so maybe this is redundant. Yeah, okay. But I want to get to the teaching the way argument. Yes, Your Honor. And it seems to me the district court relied heavily on Dr. Trout's analysis of this Goudreau reference, but I don't see anywhere in the record where he explains what a reference about, we'll call it R, right?  Formulation is indicative of how the A formulation would behave. And I only see discussions about how A is more potent than R, but did your expert provide anything additional as to why R and A would behave similarly? I mean, this is just an odd kind of teaching the way when you're not directing it to what we're talking about, right? Sure, well, I... How do you get there? Sure, so it was undisputed that this reference that's the subject of the teaching the way that Goudreau reference was the closest prior R. The district court found that at A197 and the only thing that Mylan cites to support, they claim on appeal on page 36 of their reply brief that they disputed that contention. The only thing they cite is their proposed order, the proposed post-trial order to the district court, which of course is not evident at A11698. And so there is no evidence of record that Goudreau is not the closest prior R and it was not a position that Mylan ever advanced below. So... I guess to put a finer point on it, your theory of teaching the way, the district court's theory of teaching the way is that a flibrocept and the R drug are essentially interchangeable and the R drug stands as a proxy for what the skilled artisans would think about a flibrocept. And yet I don't see the basis for that premise that these two things are interchangeable or one is a fair substitute for the other. Where is the bridge for that kind of thinking that arises with assuming that whatever that might be bad about the R drug necessarily is also going to be equally bad, if not worse, for a flibrocept. Sure. So the district court's T2A findings were A174 to 77 and there were a number of findings that are relevant. But to your honor's point, both of these drugs, the R drug and the flibrocept, the A drug, have the ideal mechanism of action. They bind VEGF in the retina. Okay, this is you talking and that's helpful but I need something in the district court's findings and rationale and analysis that I can focus on and see, okay, that's a fair fact finding that I can get behind versus, oh, there's a hole in the analysis that leaves me wanting and I can't just rely on an attorney argument today trying to talk it away. Sure. I mean, so I think focusing on the pages that I just referenced, the A174 to 177, it seemed to be understood through the eyes of the POSA that these two molecules had the same mechanism of action and the performance of one would be indicative of the performance of the other. So, for example, at A175, the district court found that because of flibrocepts... Where were you on the page? Sure. This is A175. Yeah, I'm there. And I'm on the... It's the second beginning of the paragraph there. It says, moreover, it was undisputed that a flibrocept was much more potent than renovizumab. Because of its higher potency, less of flibrocept is needed to inhibit the same amount of VEGF as compared to renovizumab. And then a little further down, it says, Dr. Trott explained that the POSA would have been motivated to use a concentration of a flibrocept lower than the 10 milligrams per milliliter renovizumab in view of a flibrocept's higher potency. And so, Doctor... That's not quite teaching away. That is more like about how perhaps a skilled artisan just wouldn't be motivated to crank up the concentration of the 40 milligrams for... But that's not saying... It's a really bad idea to use a flibrocept of 40 milligrams per milliliter. And just to tag on to that, I can't recall any other cases on teaching away where one was relying on something different because maybe there's some similarity to then say, this teaches away even though it's different for this. Do you know of any cases that have done that? Well, I don't... I'm not sure I know exactly this particular scenario, but this is not a different... These are not two different disclosures in the sense that they're both... These are the two leading VEGF antagonists at the time. They were kind of both in development at the time. And the evidence is that POSA was looking at the development of ranibizumab, the R drug, in order to inform how to go about developing a flibrocept, the A drug. And so, these are drugs that have the same mechanism of action. And the undisputed testimony at trial through Dr. Trout over pages of the district court's findings is that the performance of ranibizumab informed the POSA how one would expect a flibrocept to perform, because they had the identical mechanism of action. And so, there was a finding that... Where is that finding? Same mechanism of action and then the experts saying because they have the same mechanism of action, we would certainly think of a flibrocept in the same way that we would think of the R drug. I might need a moment to locate that, but I would say that all of the testimony that I've been referring to is based upon the understanding, which is undisputed, that the performance of the R drug informed the POSA's expectations regarding a flibrocept. That was the understanding on which Dr. Trout was testifying. I'm looking at that page with the district court. Is there anything the district court... Did the district court make a finding like that? I mean, she says the comparison she has that you called out, which is that a flibrocept is more potent than the R drug. But, you know, okay. I'm calling a friend here. So, another finding here is that A187, which compares ranibizumab and fusion proteins like a flibrocept. What heading is this under? This is in the context of... This is the invalidity analysis for autism. Okay. And the discussion here on A187 talks about the POSA wouldn't expect that a different protein would have the same native confirmation. The higher required concentration of a flibrocept compared to ranibizumab undermine any reasonable expectation of success. So, again, comparing these two drugs has the same mechanism of action, both VEGF antagonists, and comparing their... and contrasting the expectations. This seems to, if I'm not mistaken, kind of work against what your position is. Your position for purposes of teaching away is to tell us that these two drugs are very, very, very close cousins. This passage seems to say just because you would get some amount of stability in one doesn't necessarily mean you'll get that same stability in the other. So, there's no... there was no contrary testimony on this point that the two drugs have the same mechanism of action and would have performed similarly, but the poster would have understood that because of the severe inflammation exhibited by Lucentis at 40 milligrams per milliliter, you would expect that a flibrocept would need a far lower concentration in order to achieve the max... in order to achieve a beneficial therapeutic effect with a lower amount of... I suppose you have back-up arguments, though, on this, right? We do. If there's some problem with the teaching away analysis, yet there's half a dozen other groups that have been identified. That's exactly right. There's... the aflibrocept sequence is not disclosed in the Fraser and Lucentis combination. The glycosylated aflibrocept is not disclosed in that combination. Neither reference has aflibrocept? No, I'm talking about the Fraser and Lucentis combination.  Neither reference has aflibrocept? In Fraser and Lucentis, I'm sorry, the Fraser discloses what's called a VEGF trap R1, R2. It does not disclose aflibrocept and does not disclose the amino acid sequence of aflibrocept. That's right. And Lucentis, of course, is about the renovizumab drug. There's no disclosure of glycosylated aflibrocept. There's no motivation to glycosylate aflibrocept. And this report found last week in a related appeal involving Samsung... How come we didn't get a 28J lab? Oh, yes. Well, that goes to the next case, though. No, it counts here, too. No, it counts more on the last case. Yeah, I will take responsibility for that. We weren't sure... Well, the other side as well. We should have gotten something from someone. We weren't sure if the... We should presume that the court was aware of the decision in the same consolidated appeal. Perhaps we should have just submitted the 28J letter out of no-funds. Well, that's a fair assumption, but that doesn't answer the next question of the reason we have 28J letters is to explain the relevance of that opinion to what the case is, which is the case we haven't gotten to yet. And we'll talk more about that. Okay, yeah. Yeah, but there, to your honest point, there are a number of differences with respect to the reasonable expectation of success, the motivation, as well as the oblivious sub-sequence that differentiate the prior art from the claim that I mentioned here. The last point I'll raise is that the... You started, Judge Prose, by asking my friend on the other side what obviousness combinations they're running here. And I heard that they're maintaining the Frazier and the Sentis and the Dix references. In their briefing, they combined those teachings. This is at page 69, I believe. Did you say in your reference that they didn't raise that to the trial judge? No, that's not right, Judge Wallach. We objected to the trial judge, in front of the trial judge, to the combination because it wasn't disclosed. The district court precluded Milan from relying on that combination. This is at A167 to 168. And yet, their opening brief argues these references together as if it's a proper combination. And so I just wanted to make sure the court was aware of that point. Thank you. Thank you very much, Your Honors. Okay, trying to keep things even, if necessary, on my calculations, which may be wrong, but I think you went eight over and you went 18 over, so that gives you plus 10. But we hope you don't need it. I will try not to use it all if I don't have to, Your Honor. A couple things I'd like to point out. First, if the 10th and 100th apply from the perspective of a person of ordinary skill in the art to 10 to 50, then it also applies to 40. So then you've got a range versus a range as opposed to a point within a range. In addition, I do want to point out that my... But you agree with your friend that your expert conceded that? Well, what he said is numerically 10 to 50 can include 10ths and 100ths. That's not necessarily the same thing, I don't think, as a person of ordinary skill in the art would concede all of those to be the same. But nevertheless, if a person of ordinary skill in the art is going to see a number 10 to 50 and see 10ths and 100ths and then they're going to see a number 40, then that also means you see 10ths and 100ths and that's a range. When it comes to the, you know, what Dick says about this class of VEGF antagonists, and that, I think, is actually where the Samsung decision that this court recently issued would, in fact, be relevant here. So one of the things that my colleague argued is that, well, Dick doesn't actually tell you about the full sequence that we've got claimed in claim one. Well, here's what Dick does do. Dick, in his examples, always uses sequence ID number four. Dick, in the specification, has a clear preference for sequence ID number four. And if we go to Dick's, this is at A12595, under the heading VEGF antagonist. So he's talking about the fusion proteins. Column five, lines 30 to 42, he specifically says, here's what the VEGF antagonists are. It includes fusion proteins in a preferred embodiment. The VEGF antagonist is the fusion protein of two or four. More preferably, sequence ID number four, and then further on, then the next couple lines, this is the same thing that the Samsung decision decided was going to be written description support for Regeneron for its claims in the 865 patent relating to the sequencing glycosylation patterns. Dick has the same identical language under the same heading because Dick's and the 865 patent are reading almost verbatim on this. It then says, in a specific embodiment, the fusion protein comprises amino acids 257 to 457 of sequence ID number four and is glycosylated at ASN residues 62 to 94, 149 to 122, and through it. That is the single sequence that is claimed in claim one of the 865 patent here. So Dick, this is where the disreport went wrong because the disreport only focused on just that one description of column two that's saying, here's what the embodiment is for 10 to 50 milligrams. But then he ignored where the specification then expands on what it means to be a fusion protein of the invention. So I think in this court's claims when we're talking about is something arranged as in the claim, when we clearly have an interrelated teaching, here's the fusion proteins, here's the ones that I prefer, here's what I most prefer. So the disreport went wrong by not looking at that particular thing to say, oh, a flipper set is something that Dix is specifically contemplating. Similarly, if we then go to Dix's examples, the 226 patent, example one, so that Dix, this is at A12596, example one, what does Dix have there? And now let's go to the 865 patent, example one. What are the ingredients? They're titled the same. Stability of a 50 milligram per ml, yeah, the 865 patent says it's VEGF-TREP liquid formulation, Dix just said liquid formulation of VEGF-TREP was contained in it. 10 millimoles of phosphate in Dix, 10 millimoles of phosphate in the 865 patent. 50 millimoles of NACL, also 50 millimoles of NACL in the 865 patent. Then we've got 0.1% polysorbate 20. Just so I can clarify, which specific issue is what you're talking about driving that? Right, this gets to the idea, my colleague from Regeneron was saying that somehow there's other elements that were missing from the Dix formulations that didn't get you to the complete claim, and particularly the stability elements. Well, as you go down, as you march through these, you then get to table one in Dix, table one in the 865 patent, you've got the same visual appearance, turbidity, pH, and stability data all above 98%. So you've got the near identical ingredients, and both Dix's 50 milligram example one, that meets each and every element of claim one and claim four and all the other asserted claims here. It just doesn't have the number 40 in it. You go to the 865 patent, yes, they've got a 50 milligram example, same stability numbers as in Dix. They've got a 40 milligram number, same stability results in Dix. Then you look at the Dix 25 milligrams for ML, so he dropped the concentration, and that's at column 12, and guess what? He uses those same formulation ingredients, gets the same stability outcome. So... Do you have expert testimony on this? Yes. And where is that? That, it is, it is to the... Okay. Let me pull out some of those. I apologize around this. I will get you those. I know we had the citations in there where they basically, where we basically did go back and forth between matching each of these up. So... Okay, can I... Yes, a couple other points around it that I did want to make. Just one quick point, as I, it was so long ago that I don't remember, but I know your friend said something about a gray brief and a citation to one of the experts, and that your description of what he said was the exact opposite, I think your friend said, of what he actually said. Do you have a response to that? Right, I did not get a chance to check it. If we did, then obviously we would withdraw that or see if there was an error in sight and there's an additional citation that needs to be made. But on a certain level, I don't think it's actually relevant because Dick already achieved 98% stability. He teaches it. He talks about it. He specifically teaches one of Ordinary Skill in the Arts how to get there. So you don't even need to look at FDA's motivations to get you there. He already got you there. So there again, that's where I get to what is the enabling disclosure. In addition, Your Honor, I did want to point out we did dispute below that this Ranibizumab drug was in fact the closest prior art. Now, I know my colleague from Regeneron said, well, you just talked about that in your briefing. That's because our whole point was it's not legally relevant. Well, did you ever say it's not legally relevant? Yes. Did you tell that to the district court? Yes, that was in our proposed findings and fact conclusions and law that the court had submitted that the closest prior art was going to be the Dix formulation. It was not going to be Ranibizumab. And I think the Janssen v. Teva case that was decided that we cited in our brief also bears this out, is that you're not supposed to be looking at what's happening with another drug to say this is how it's going to behave for hours. And then additionally, I also wanted to point out that when it comes to this issue of criticality, we do know from Dix that the desirable benefit of stability was actually achieved, not only for the lower concentrations, but for even higher concentrations, 50 milligrams, 75, 100 milligrams per ml. So under Abbott v. Baxter, 471F3rd at 1368, the fact that they may have found, even if we assume from the district court's findings, we may have found some additional property that we think is beneficial, that doesn't change the fact, and I think Abbott even said, even if you put it in your claims, that still doesn't change the fact that when these are composition claims and the compositions are achieving the same outcomes, the same utilities, there just isn't any difference there and there's no anticipation. And I think that IMEOS,  rejected the idea that you can start having these little chains of inferences to also get to criticality to somehow support your claim. All right. Thank you very much. We thank both sides. The case is submitted.